Good morning, your honors. David Merchant from the Federal Defenders of Montana on behalf of Mr. Zabroski. I'd ask for two minutes to reserve. Search and seizure law is fundamentally factually driven with legal landmarks along the way to help guide the court. You have the consensual encounter, which could move into an investigatory stop or seizure. You have the detention, and then you have the arrest. We're lucky in this case because Officer Schneider just jumps right to the arrest. Terry gives us... By the way, you didn't cite my recent opinion that went all over this. Yeah, it was pointed out to me actually yesterday, and I... I know. Terry gives us a starting point, your honors, where if the officer believes that a suspect has a weapon, they can search them over the clothing, non-intrusive, for the dangerous item. But that search requires particular facts specific to the individual being searched. And in this case, we have no facts that lead us to the individual, Mr. Zabroski, Travis, having any weapon at all. Keep in mind, what happens is, at 1.23 in the morning, a casino is robbed on Grand Avenue in Billings. Eighty minutes later, the police are called to respond to Travis Zabroski at least three miles away. What happens in this case is the officer who first responds to the casino robbery gets a brief detail of information. Average white male, average weight, wearing all black, athletic. There's a large amount of money. He was at 2.20 in the morning also. 1.23 is when the police report indicates that the... So he gets there at like 2.20, and he's a person who matches the description. With all due respect... All black and the sort of nylon-y material. Well, he gets there about 2.40, your honor, because at 2.42, the second officer responds and it takes about two minutes. From the time that the officer... There's a dispute about that because I have in my notes 2.23. He was at the Holiday Station. No, I'm sorry. 2.42 is when the second officer... When Snyder put Zabroski in handcuffs and called for backup officers, according to my notes. I don't know what's in your notes, your honor, but the response to the casino robbery was 1.23. Officer Ward responds to Officer Snyder at 2.42. Okay, and so between that time, Snyder went to the Holiday Station and encountered Mr. Zabroski, right? Yes. He saw the ID in his wallet and then said, do you have ID? And he says no. He sees the 50s and the 20s. I mean, this is all from the testimony that Officer Snyder gave, I suppose. If I could correct the facts just somewhat, Officer Snyder sees Zabroski walking out of the bathroom, on the phone, rubbing his belly, hand under his shirt. Zabroski walks five steps to a water cooler and then about 20 feet to the counter. The officer immediately turns and follows him. Zabroski puts the two bottles of water on the counter, opens his wallet to pay. At that point, Snyder says to him, hey, do you have any ID? I'm sorry, there's one other verbal before that is when Travis walks out of the bathroom and says, excuse me. So we have cases that say when the report is that there's two men that look like they're of Iranian or Mexican descent who committed a crime, that was okay for them to stop two men. I mean, based only on that, really, and I think they put them in handcuffs at that point. Again, with all due respect, that's... Our standard for these terrorist ops seems pretty low. It is low, but you're talking about Batista. Batista is the robbery. There's a car in between that's been reported, and there are two men walking in a deserted street. It's raining outside. These guys are wearing dry clothes. I mean, that doesn't seem very persuasive to me. I mean, so they're dry? They were driving in a car. Of course they're dry. So what's the connection? We say, well, it's okay. It's good enough for investigating. They are just investigating, and that's fine. What happens is there's one officer. He takes the two people, Batista and the other gentleman. He has them handcuffed for his own safety because there's been a robbery within 15 minutes. This is 80 minutes later, with all due respect. This is across town. How does this compare with the facts in Edwards? Edwards is where the gentleman, there's a shooting that's reported. The police officer is on scene within about two minutes, Your Honor. There are two individuals out there. There's a Hispanic man, and there's another man. The man who was supposed to be driving away on a bicycle is within a couple of feet of a bicycle. Again, there's a timing sequence, and there's other indicia of reliability to the reasonableness of this. This is a guy who's wearing a different size. Are you arguing that there was no reasonable suspicion to approach Lebroski? No. I think there's always, a police officer is always entitled to ask somebody, hello, how are you doing? All right. So where did it go wrong? Well, it goes wrong almost immediately after that, because there's a couple of things that occur. There's the bottles of water. He's trying to pay. He opens the wallet. There's a large amount of cash that was taken from the casino. We don't know anything more. He knows nothing more, Officer Schneider. He sees 20s and 50s. 20s and 50s, right? No, he doesn't. He testifies that that's what he was told. No. With all due respect, that's not true. He testified that he knew that there was a large amount of cash taken. So then he sees a large amount of cash in the wallet. And he says, do you have a job? Where are you working? And Zabroski says. I thought, wait a minute. What happened to the ID question? If I can get to that. He asks first if he has a job. And he says, no, I'm not working. Then he asks for the ID. Yeah. And Zabroski says, no, it's in my car. That's what Schneider testifies to. Not that he has no ID. He tells everybody he has no ID, but actually he testifies at the. Didn't the officer see the ID? He did see the ID. Okay. So now he's just reinforcing his suspicion, right? No. That is one. Officer Schneider says that the untruthfulness of the ID, the large amount of 50s and 20s, and the fact that he's wearing the same clothing, which he also says no. But the other thing is he takes him, he frisks him. He puts the hands behind the back and he frisks him. And then he puts him in handcuffs. He frisks him for officer safety. This is where we go wrong. Is it your position that he handcuffed him before? Before what? Right at the outset? Yes. How do you derive that? Because it's in the transcript, Your Honor. The district court judge did not make a specific finding one way or another. District court. You didn't ask the district court judge to make a finding. No, I didn't. You didn't handcuff. No, I did not. But Officer Schneider testifies that he handcuffs him when he puts him behind his back to begin the Terry frisking. If you look very carefully, it seems pretty clear to me that he handcuffed him. He handcuffed Zabrowski after the pat down. Your Honor, I believe he testifies that he puts both hands behind his back so he can control him and hold him. He does the over the clothing, and then he puts the handcuffs on. That's after. That's after the initial Terry frisk. So during the pat down, Mr. Zabrowski says, yes, I'm on probation for robbery. And then later in the transcript he says for armed robbery. Yes. Is that correct? Yes. Okay. So he's had a report that there was a robbery at the casino with a person who meets his description, and then this person says, I'm on probation for armed robbery. He does. But at that point, it's during the detention of him. At this point. So then he puts the handcuffs on after he hears that. With all due respect, I disagree with that. I believe that that part of the questioning was part of where he was in handcuffs. Okay, well, we'll look at the record and see what we can find out. But I have one question. Was this officer under the impression this was an armed robbery? Yes, it was. Okay, so he had reason to suspect and approach Zabrowski. He sees some evidence that's consistent, that is a large amount of cash. He lies about his ID not being on him. And then he knows it's an armed robbery. So coming back to Edwards, why is this not fit within the officer's perspective that he had reason under a Terry stop to put him in handcuffs? Okay, well, let's assume that you're correct, that he has reasonable, that he can put him in handcuffs. Keep in mind that Schneider testifies that Zabrowski pulls his shirt up to show him. That has to occur prior to his hands behind his back and being handcuffed. Would you agree with that? And the second thing is once he's done that, he's demonstrated that he's not hiding anything. And after he feels him, the dangerousness of that person has evaporated. And from 2.42 until 3.10 in the morning, 3.10 is when they call the probation officer to find out that he's on probation for sure and that the probation officer wants him arrested for a curfew violation. So there's 28 minutes, more likely 30 minutes, where he's sitting at the counter in handcuffs. At that point, they can determine he's not a danger anymore. He could have gone right out and talked to his wife who's sitting in the car. Do you have a probable cause at that point to arrest him? Absolutely not. He has done nothing at this point. And Officer Schneider even says he has done nothing to the point where he has him in handcuffs, except he vaguely matches his description as an average white male wearing black. He's not even wearing the same type of coat. It's 80 minutes later, which takes it out of Edwards. It's also significantly further away, 3 miles, in Billings, Montana, versus just around the corner of a street where Edwards' officer approaches. I see I've got this. Wait a minute. Just one second. You're trying to suppress evidence that was in the vehicle, correct? I am. So how does they learned about they got the authority to search the vehicle through the arrest through the probation officer? At 3.10 in the morning. At 3.10 in the morning, with all due respect, Travis Zembrowski shouldn't still be at the holiday station. He was being investigated for being a suspect in a robbery. There's multiple ways that this officer could have investigated that further. But you're suggesting that it's okay to stay handcuffed at a counter when I could go out and ask the wife, hey, where were you two hours ago? Why do you have money? Are you working? Did you get a college loan to have money in your pocket? The fact that he doesn't have a job is not indicative of a nefarious activity, Your Honor. The fact that he has buying water, he's done nothing in this holiday store, yet he's detained for over a half an hour before they even get to talk to a probation officer. That probation officer call could have been made at 2.54, 2.45, three minutes after. All right. Thank you. I'll give you a minute for rebuttal. Let's hear from the government. Good morning, Your Honor. May it please the Court. Brendan McCarthy, Assistant United States Attorney, District of Montana. You didn't cite Edwards, either. I did not, Your Honor. But I do have another case that I did find that. What was it about the opinion that you thought wasn't relevant to this case? It is relevant, and the Court did go through the Fourth Amendment analysis, and we did discuss it before this morning. But I did want to correct the record as far as counsel some of the points.  It's in the record. ER 62 and 83. In terms of the officer did testify that he saw not just a large amount of cash, but 20s and 50s in Mr. Zabrowski's wallet. That is on page 60. And that is important because the officer had spoken with the victim of the robbery, who not only said that a large amount of cash was stolen, but that it was in $20 and $50 denominations. So seeing the $20 and $50 is specifically tied to the facts of this robbery. Could I ask the ---- there is a testimony that the officer suspected a probation violation once Mr. Zabrowski volunteered that he was on probation. Why would he suspect a probation violation merely because Mr. Zabrowski was on probation at that point? It may have been the officer's belief that based on the fact that he was going to relate to the probation officer, that the probation officer may have authorized him. I mean, is that being in the SEDORA 220 in the morning per se a curfew violation for every probation? I don't believe so, Your Honor. And I don't believe it's real. I don't think it's really material at this point if the officer thought that the Mr. Zabrowski was going to be revoked. Or if the probation officer was going to ask him to be detained. But I think in terms of the probation officer, I think the time that elapsed, the 20 or 30 minute time that the Mr. Zabrowski was in handcuffs until he actually spoke with the probation officer, this was early, early in the morning. They had to contact the probation officer. I think the officers acted diligently during that set of circumstances. But that's normal procedure to check if somebody's on probation, check in with the probation officer before you release somebody from handcuffs? I don't know if it's normal procedure to call the probation officer. The testimony, though, was that they were ‑‑ it was normal procedure for the officer to ask someone during the pat-down search whether or not they're on probation or paper. Once the officer was told that this individual was on paper for armed robbery, the same crime that he was investigating, I think it added to the sort of composite, the totality of the circumstances. And I think the purpose of contacting the probationer was to relay those circumstances, see whether or not ‑‑ So at what point ‑‑ do you believe at any point along this chain here that there was probable cause to arrest him? And if so, when did that occur? If there is probable cause, it would be at the point when he was actually detained and brought back to ICDF. I think what is different about this case is that he's a probationer. The search condition for his probation is reasonable suspicion. And the question ‑‑ Up until the time they take him back to the station or transport him to the station, it's the government's position that there was ‑‑ this is just a Terry stop, an investigatory stop. Right. That's all that's taking place. There's nothing excessive taking place here. No, I did not ‑‑ I do not believe it rose to the level of probable cause, but I believe that there ‑‑ this is reasonable suspicion and that the officer has articulated several factors that show that he had a particularized suspicion that the ‑‑ that justified the Terry stop. But you don't think he's under arrest when he's put in handcuffs and then taken to the station? No. Well, clearly he's being detained at that point. He's not free to leave. He's not free to leave. So that's an arrest. Right. Okay. So the probable cause emerged when in that sequence, just to backtrack on what Judge Paez asked? Well, if the Court believes that ‑‑ Still at the gas station? Still at the gas station, right. He wasn't moved to any other location. I mean, he was placed in handcuffs after the Patton search. So does the placing in handcuffs alone require a finding of probable cause? I mean, we have cases saying no, you can detain somebody in handcuffs under certain circumstances and it's still a Terry stop. So when did the detention in the gas station ripen into a non‑Terry stop, an arrest? I don't believe that just placing someone in handcuffs alone means that an arrest has occurred. I don't believe that there was actually an arrest here. I think that the handcuffs were placed during the course of the Terry stop, which happens sometimes during the course of Terry stops. And the reason for the handcuffs in this point was officer safety. The officer testified that the appellant's clothes were baggy. He did perform the Patton search to see if there were any large weapons, but he was still concerned about small weapons. Again, this is late in the evening, early morning hours. The officer was the only one that responded. This was a chance encounter. He did not know that he was going to run into Zabrowski at that time. He had to call for backup. I think it was reasonable for him to detain Zabrowski in handcuffs, since he was the only person there, calling for backup. And even when backup arrived, the testimony is that some of the officers were outside speaking with Zabrowski's wife, who is in a car. So there was ‑‑ there was ‑‑ our position is that there was concern for officer safety. There was a chance that Zabrowski could flee, and that justified. But, yes, I accept all that. But that goes into whether he's free to go also. So the question is, did it ‑‑ when did it change from an investigative Terry stop to an actual detention for purposes of transporting him down to the station? I don't think it ripened into an arrest, that probable cause was needed. I think this is all part of a Terry stop. I don't ‑‑ the Court has not drawn bright-line rules in terms of how long a Terry stop must last. I know ‑‑ I know. That's why I'm trying to guess. So when do you think it did? I think that it did ‑‑ he was arrested when he was arrested, which was when he was brought down to the jail. Before then, it was still all part of ‑‑ When they transported him, they said, we're taking you down. Yes. But they learned from the probation officer. Right. And the probation officer told them to detain him. And they found the drugs, right? At that point. Right. And that really wasn't challenged, but the drugs were found during the search of the car. There was this book that really wasn't a book, and they searched the book safe and they found a handgun and methamphetamine. If there's no further questions, I see the rest of my time. Mr. Merchant. Judge Fischer, the arrest occurs when the probation officer says detain him for the curfew violation after 310. How it turns from ‑‑ I'm sorry. It's just because you made a point about the time. The time. I'm sorry. I'm sorry. I'm just ‑‑ Okay. So when in the sequence of the time you laid out, do you say that the arrest during the time he was held, you said he was down at the station for, what, 28 minutes or so? So when in the sequence of time do you think the arrest happened? I think the arrest happened within minutes after placing handcuffs on him. I think that to answer to both questions, the official time that the arrest occurs where I believe probable cause exists is when the probation officer says detain him for a curfew violation after 310. That's the formal arrest. That's the formal arrest. And you think there was a constructive arrest. Absolutely. At one point. Yes. And relying on your case, Edwards, which cites to Washington v. Lambert, there are three things that you said to look at. The intrusiveness of the stop, the aggressiveness of the police, and how much liberty was restricted. And then encounters can turn into an arrest based upon the reaction of the suspect. If they're cooperative, for instance, as in Washington v. Lambert, he was a cooperative person, as was Zambrowski. But there are times where handcuffs don't mean an arrest. Somebody is fleeing the police. They're brought out of a car. Somebody is drunk and aggressive. Those are for officer safety purposes. Officer safety ended about 245 in this case, with all due respect. After he had them cuffed, he could have frisked them again. In fact, Officer Snyder testified at his hearing that he never frisked him again after that, even before putting him into the car. He never once again suspected that he was dangerous. So we have him at the counter of the store for at least 28 minutes, and the second officer arrives at 242, and then the whole squad comes. There are four, five, perhaps a half a dozen other officers there. Nobody frisks him for being dangerous. He is just held there. He is being questioned. They don't know that he is a curfew violation. They don't know there's anything else. All they know is that he vaguely resembled a suspect from an armed robbery 80 minutes before, but we know that he wasn't wearing the right clothes, and we know he's not the same weight. And they knew he was on probation. No. They knew he was on probation. Yes, they did. They knew he was on probation. Right away. They knew he was on probation. Right at the get-go. Right at the get-go. But being on probation isn't a violation of the law. Isn't it reasonable for the officers to want to check with the probation officers? It is. But they should have done that right away, not wait 30 minutes. We only had one officer. There was only one officer out there at the time. No. There was one officer at 240. There was a second officer at 242. And by 250, there are at least four other officers there, all in uniform, all in squad cars. With all due respect, they sit there for 20 minutes, four, five, six officers, and they don't call the PO. And do you know at what exact moment they called the probation officer? 310. 310. It's testified to by the case agent at the end of the transcripts. And then what time did the probation officer call back? You got them on the phone. In Billings Police Department, probation officers are routed through dispatch. So the officer calls dispatch. Dispatch then calls the probation officer. The probation officer spoke directly to the officer after 310. Thank you. Thank you. Thank you, counsel. The matter is submitted.
judges: Fisher, Paez, Ikuta